| | | |
|---|---|---|
| HERMIONE KELLY IVY WINTER, | : | |
| formerly known as David Allen Allemandi, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 16-890-LPS |
| | : | |
| MONICA MILLS, et al., | : | |
| | : | |
| Defendants. | : | |

---

| | | |
|---|---|---|
| HERMIONE KELLY IVY WINTER, | : | |
| formerly known as David Allen Allemandi, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 17-1432-LPS |
| | : | |
| DR. P. MUNOZ, et al., | : | |
| | : | |
| Defendants. | : | |

---

| | | |
|---|---|---|
| HERMIONE KELLY IVY WINTER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 18-351-LPS |
| | : | |
| CHRISTOPHER SENATO, et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

## I.     INTRODUCTION

Plaintiff Hermione Kelly Ivy Winter ("Plaintiff"), formerly known as David Allen Allemandi,

an inmate at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, has filed

several actions in this Court pursuant to 42 U.S.C. § 1983. Plaintiff appears *pro se* and has been granted leave to proceed *in forma pauperis*.

## II.    BACKGROUND

In the three above-captioned cases, Plaintiff seeks treatment of gender dysphoria and a religious diet. Plaintiff filed motions for injunctive relief in Civ. No. 16-890-LPS at D.I. 28 and Civ. No. 17-1432-LPS at D.I. 25. The Court ordered Defendants to respond to the motions with responses due on or before March 15, 2018. Defendants filed the same response in both cases. (*See* Civ. No. 16-890-LPS at D.I. 36; Civ. No. 17-1432-LPS at D.I. 32)

In the meantime, Plaintiff commenced a new civil action and filed two motions for injunctive relief. (*See* Civ. No. 18-351-LPS at D.I. 3, 10) On March 19, 2018, she filed another motion for injunctive relief in Civ. No. 17-1432-LPS. (*See id.* at D.I. 40) On March 23, 2018, she filed six more motions seeking injunctive relief: three in Civ. No. 16-890-LPS at D.I. 42, 43, and 44, and three in Civ. No. 17-1432-LPS at D.I. 42, 43, 44. On March 26, 2018, Plaintiff filed identical emergency motions for injunctive relief in Civ. No. 16-890 at D.I. 45 and Civ. No. 17-1432-LPS at D.I. 45 threatening a hunger/liquid strike if he does not receive a vegan diet. Because the recent motions for injunctive relief seek the same relief as is sought in the motions to which Defendants filed responses, the Court sees no need to order Defendants to respond to the motions filed in Civ. No. 16-890-LPS at D.I. 42, 43, 44, 45; Civ. No. 17-1432-LPS at D.I. 40, 42, 43, 44, 45; and Civ. No. 18-351-LPS at D.I. 3, 10.

Plaintiff identifies as a woman. She seeks injunctive relief to receive medical care in form of "feminizing hormone replacement treatment" and an adequate nutritional religious vegan diet, both of which she states have been recommended by physicians and religious leaders. She wants a television and also asks that she be allowed to possess her "greeman witch talisman" which protects her and keeps her focused. (*See* Civ. No. 17-143-LPS at D.I. 40; Civ. No. 18-31-LPS at D.I. 3, 10)

2

Plaintiff threatens self-castration, suicide, and that she will starve herself if, by March 30, 2018, she is "not provided a high caloried high protein vegan tray, [] feminizing HRTs, and a T.V." (D.I. 40 at 2)

## III.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that should be granted only if: (1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("NutraSweet II"). The elements also apply to temporary restraining orders. *See NutriSweet Co. v. Vit-Mar Enterprises., Inc.*, 112 F.3d 689, 693 (3d Cir. 1997) (*"NutraSweet I"*) (temporary restraining order that continues beyond time permissible under Rule 65 must be treated as preliminary injunction, and must conform to standards applicable to preliminary injunctions). "[F]ailure to establish any element in [a plaintiff's] favor renders a preliminary injunction inappropriate." *NutraSweet II*, 176 F.3d at 153. Furthermore, because of the intractable problems of prison administration, a request for injunctive relief in the prison context must be viewed with considerable caution. *See Rush v. Correctional Med. Services, Inc.*, 287 F. App'x 142, 144 (3d Cir. July 31, 2008) (citing *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995)).

## IV.    DISCUSSION

### A.    Gender Dysphoria

Plaintiff seeks an order requiring Defendants to place her on hormone replacement treatment ("HRT"). (*See* Civ. No. 16-890-LPS at D.I. 28; Civ. No. 17-1432-LPS at D.I. 25, 40) She threatens to harm herself if the treatment is not provided by March 30, 2018. In opposition to the motions, Defendants submitted a comprehensive summary of Plaintiff's condition prepared by

3

Robin Belcher-Timme ("Dr. Belcher-Timme"), chief psychologist of Connections Community Support Programs ("Connections") and chair of the Gender Dysphoria Consultation Group ("GDCG"). (*See* Civ. No. 16-890-LPS at D.I. at Ex. A; Civ. No. 17-1432-LPS at D.I. 32 at Ex. A)

As explained by Dr. Belcher-Timme, Plaintiff identified herself to the treatment team as transgender in early 2015, and was diagnosed with gender dysphoria on March 22, 2017. The treatment provided to Plaintiff is consistent with Delaware Department of Correction Policy 11-E-14 Treatment of Transgender Persons 2, and Connections' statewide procedure for the evaluation and treatment of gender dysphoria. Plaintiff's treatment is coordinated by her treatment team with the GDCG and her case is followed closely by the GDCG with consultation to the treatment team at VCC on a regular basis. Dr. Belcher-Timme explains that individuals transitioning from male to female, and who begin HRT, experience significant mood alteration and lability as they adjust to decreased levels of testosterone and increased levels of estrogen, along with other physical and psychological changes. For individuals with premorbid diagnosed serious mental illnesses, especially those conditions that include affective dysregulation like borderline personality disorder, these potential side effects are more pronounced and cause significant distress for the individual. Dr. Belcher-Timme states there is fear that the risks can outweigh the benefits of HRT in particular cases, and it is not always in the patient's best interests to rapidly impose medical interventions that can have an iatrogenic and dangerous impact.

Dr. Belcher-Timme's report and Plaintiff's medical records indicate that she receives continued and regular treatment for her condition, including individual therapy twice a week and group therapy five days per week. In addition, the medical records indicate that Plaintiff is closely followed for psychiatric close observation due to her suicidal ideation. In October 2017, Plaintiff was placed in the Residential Treatment Unit at the VCC, where she remains to date. The unit is

4

designed for individuals diagnosed with serious mental illness. Plaintiff has been seen dozens of times by mental health clinicians and psychiatric providers and has been consistently diagnosed with post-traumatic stress disorder and personality disorders. Plaintiff has been placed on psychiatric close observation due to concerns about suicidality, which are consistently conditioned on her demands for HRT.

There are several factors considered when determining whether Plaintiff is a candidate for HRT. Plaintiff must demonstrate a persistent, well-document diagnosis of gender dysphoria. She has been diagnosed with gender dysphoria for less than one year and has not allowed the prescribed interventions to have an impact due to her demands for the interventions she desires. Plaintiff has not engaged in the treatment plan offered her, which would allow the treatment team to evaluate the impact of the interventions.

The record also indicates there are potential risks and benefits of HRT. Dr. Belcher-Timme states that Plaintiff is haunted by a history of intense trauma which clearly impacts her functioning and will not magically disappear as a result of physical transitioning. Dr. Belcher-Timme notes that Plaintiff will face conflicts and changes regardless of her gender and this needs to be truly appreciated before moving forward with permanent interventions.

Plaintiff must have reasonably well-controlled symptoms of mental illness. Dr. Belcher-Timme states that Plaintiff's emotional lability, threats of self-harm, recent severe self-injury and placement on psychiatric close observation, rejection of help offered by the treatment team, constant threats of litigation, intentional refusal of intake to create weight loss attributable to gender dysphoria, avoidance of engagement in treatment for trauma, and other symptoms of diagnosed borderline personality disorder, are extremely concerning. Plaintiff has been clearly told that if she participates in a treatment plan that has a substantial likelihood of improving her symptoms,

5

specifically one that targets her intense and unimaginable history of psychological trauma, HRT would be recommended. However, according to Dr. Belcher-Timme, Plaintiff has chosen to avoid this treatment plan.

Dr. Belcher-Timme states that Plaintiff's case has been updated and reviewed monthly, and appropriate, calculated interventions have been provided to her. However, as the GDCG and the treatment team have recommended and implemented specific treatments, Plaintiff has reported an increase in distress. Also, Plaintiff has struggled to appreciate the risks associated with HRT and other interventions. Dr. Belcher-Timme states that Plaintiff demonstrates what is often called "magical thinking" -- that is, the notion that all of her problems will be solved by physically transitioning from male to female.

Dr. Belcher-Timme states that Plaintiff's conditional threats of self-harm and suicide are very concerning and disturbing, are signs of psychiatric instability, and are not an adequate reason to move forward with additional interventions. Dr. Belcher-Timme further states that, not only does the World Professional Association of Transgender Health recommend the attainment of a reasonable level of stability prior to consideration for HRT, but ethical clinicians involved in the treatment and consultation of this case must consider the potential exacerbation of these symptoms that could occur following initiation of HRT. Given these clinical concerns, Dr. Belcher-Timme states that the GDCG and the treatment team feel it would be unethical and not in Plaintiff's best interest to move forward with an HRT consult at this time.

As is well-established, a prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05.

6

However, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *See Estelle*, 429 U.S. at 107 (1976). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

Plaintiff has not refuted the evidence of record which indicates that, at this time, the medical professionals treating her have concluded that she is not a suitable candidate for HRT, given her inability to appreciate the risks of the treatment, her avoidance of the offered treatment plan, and her mental instability. Plaintiff may opt not to follow medical recommendations, but she is not entitled to choose the type of treatment she desires. As discussed above, at this time HRT is not medically indicated. In the future Plaintiff may be a viable candidate for HRT should she follow the advice of those treating her.

In light of the forgoing, the Court finds that Plaintiff has demonstrated neither the likelihood of success on the merits, nor irreparable harm. Therefore, she has not proven immediate injunctive relief is justified. Therefore, the motions will be denied.

**B.      Religion**

Plaintiff seeks a high calorie, high protein vegan religious tray diet. She threatens a hunger/liquid strike if she is not provided the diet. Plaintiff claims that the warden and chaplain approved and recognized her need for the diet but it is not being provided. She also wants permission to possess her protective "greeman witch talisman." Plaintiff states that she is "not a

Wiccan, [she] is of the blood; a hereditary witch." (Civ. No. 17-1432-LPS at D.I. 40 at 1)
Defendants oppose and provide the declaration of Christopher Senato in support of their position.
(*See* Civ. No. 16-890-LPS at D.I. at Ex. E; Civ. No. 17-1432-LPS at D.I. 32 at Ex. E) Defendants
explain that Plaintiff has changed her espoused religious beliefs recently, which has called into
question the sincerity of those beliefs. They advise that the DOC religious diets consists of kosher
and vegetarian meal options, and vegan meals are not currently offered. Finally, Defendants advise
that due to Plaintiff's well-documented history of gastrointestinal problems she cannot be medically
cleared to a vegetarian diet. Plaintiff was previously provided a vegetarian meal and her
gastrointestinal problems persisted, only to resolve when she was taken off the vegetarian meal.
Plaintiff's medical health providers recommend that she not be placed on a vegetarian diet and note
that she is currently at a healthy weight.

Prisoners have a First Amendment right to practice their religion. *See Bell v. Wolfish*, 441 U.S.
520, 545 (1979). When alleged religious interference stems from a prison policy, four factors are
relevant in determining the reasonableness of the regulation: (1) "there must be a valid, rational
connection between the prison regulation and the legitimate governmental interest"; (2) whether the
inmate has an "alternative means of exercising the right" at issue; (3) the burden that the
accommodation would impose on prison resources; and (4) "the absence of ready alternatives."
*Turner v. Safley*, 482 U.S. 78, 89-91 (1987). When a prisoner claims that her right to exercise religion
has been curtailed, a court must determine as a threshold matter whether the prisoner has alleged a
belief that is "both sincerely held and religious in nature." *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir.
2000). If so, the court must then apply the four-factor test set forth in *Turner*, 482 U.S. at 78, to
determine whether the curtailment at issue is "reasonably related to penological interests," *DeHart*,
227 F.3d at 51.

8

Here, other than to state that she is a hereditary witch, Plaintiff has not alleged her religion nor spoken to her religious beliefs. Hence, it cannot be determined whether her belief is both sincerely held and religious in nature. Plaintiff does not indicate whether the talisman is related to her religious beliefs. With regard to a vegan diet, when Plaintiff was provided a vegetarian meal, it had an adverse impact upon her health. There is nothing in the record that indicates a vegan diet would not have the same effect in light of the similarity between a vegan and a vegetarian diet. Given the record, the Court finds that Plaintiff has demonstrated neither the likelihood of success on the merits, nor has irreparable harm. Immediate injunctive relief is not warranted. Therefore, the motions will be denied.

## V.     CONCLUSION

For the above reasons, the Court will deny the motions for injunctive relief filed in Civ. No. 16-890-LPS at D.I. 28, 42, 43, 44, 45; Civ. No. 17-1432-LPS at D.I. 25, 40, 42, 43, 44, 45; Civ. No. 18-351-LPS at D.I. 3, 10. Plaintiff is placed on notice that the Court will docket, but not consider, future repetitive filings seeking the same or similar relief given that no defendants have been served and the operative pleadings must be screened by the Court.

An appropriate Order follows.

UNITED STATES DISTRICT JUDGE

Dated: March 26, 2018